# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 12, 2011 Session

## STATE OF TENNESSEE v. CHARLES JACKSON AND WILLIS HOLLOWAY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-01388      Lee V. Coffee, Judge**

---

**No. W2010-01133-CCA-R3-CD  - Filed February 17, 2012**

---

A Shelby County Criminal Court Jury convicted each of the appellants, Charles Jackson and Willis Holloway, of two counts of aggravated robbery, a Class B felony; two counts of aggravated kidnapping, a Class B felony; and one count of aggravated burglary, a Class C felony. After a sentencing hearing, they received effective forty-four-year sentences. On appeal, the appellants contend that (1) the trial court erred by refusing to allow them to cross-examine a co-defendant about her engaging in prostitution before the crimes; (2) the trial court erred by admitting the co-defendant's complete written statement into evidence; (3) the trial court erred by giving each juror a copy of the statement; (4) the trial court erred by failing to redact the statement; and (5) the evidence is insufficient to support the convictions. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by admitting the co-defendant's complete statement into evidence but that the error was harmless. Therefore, the appellants' convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Mark Mesler, Memphis, Tennessee, for the appellant, Charles Jackson, and Joseph S. Ozment, Memphis, Tennessee, for the appellant, Willis Holloway.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Anita Spinetta and Rachel Newton, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# I. Factual Background

The record reflects that a Shelby County Grand Jury charged the appellants and two co-defendants in a seven-count indictment. Specifically, the appellants were charged jointly as follows: count one, aggravated robbery of Clarence Powers; count two, aggravated robbery of Nadine Powers; count three, aggravated kidnapping of Clarence Powers; count four, aggravated kidnapping of Nadine Powers; and count five, aggravated burglary. Their co-defendants, Kim West and Larrisa Richardson, were charged jointly in counts six and count seven with facilitation of aggravated robbery.

At the appellants' trial, eighty-five-year-old Clarence Powers testified that in September 2008, he had a house for rent on Sparks Street in Memphis. The house was next door to his own home. On September 16, Mr. Powers showed the rental house to Charles Jackson and spent five to ten minutes with Jackson. Jackson liked the house and made an appointment for his sister to see it sometime between 10:30 and 11:00 a.m. the next day. On the morning of September 17, Mr. Powers took his wife to a chemotherapy appointment, and they returned home between 10:30 and 11:00 a.m. As soon as they got home, someone rang the doorbell. Mr. Powers said that his wife answered the door and that a man told her, "'I'm here to look at the house.'" Mrs. Powers walked away from the door, and Jackson and Willis Holloway came inside. Mr. Powers said Jackson pointed a gun at him and told him, "'Okay. It's a hold up.'" Meanwhile, Holloway ran to the back of the house. Mr. Powers stated that Jackson ordered him onto the floor, stood over him, and said, "'They say you got a safe in here. . . . Give me the combination on it.'" Mr. Powers denied having a safe, and Jackson grabbed him by his belt, carried him into the den, and threw him onto a love seat. Holloway brought Mrs. Powers into the room and threw her onto a couch. Mr. Powers said that Jackson told Holloway, "'Go out to the truck and get a brand new roll of tape and bring it back in.'" Holloway left and returned with a roll of duct tape. He taped Mrs. Powers's hands behind her back, taped her legs together, and put tape on her face. Then he taped up Mr. Powers the same way. The appellants began ransacking the house. Mr. Powers said that a few minutes later, "the house got silent." He managed to free himself, locked the front door, and freed his wife. The appellants returned to the house and tried to get in the front door but found it locked. They left, and Mr. Powers telephoned the police. He said the appellants took all of his wife's jewelry, his new "pump gun," seven hundred fifty dollars that had been in a drawer, and a small safe containing eight thousand dollars.

Mr. Powers testified that the robbery lasted twenty to thirty minutes and that he was not injured. At some point, the police showed him some photograph arrays, but he did not identify anyone. Later, officers showed him additional arrays, and he identified the appellants as the robbers. At the appellants' preliminary hearing in February 2009, Mr. Powers was shown two men in court. He positively identified Holloway as one of the

robbers but misidentified another man as the second robber. Jackson was not even in the courtroom at the time of the identifications. Mr. Powers said he later realized his mistake and informed someone in the courtroom. He said he wore glasses only to read.

On cross-examination, Mr. Powers testified that both of the appellants had guns during the robbery and that Holloway put on gloves before he taped up Mrs. Powers. Jackson did not put on gloves. At first, Mr. Powers stated that he picked out the appellants' photographs three or four hours after the robbery. However, he later acknowledged that according to the date he wrote on the appellants' photograph arrays, he identified them as the robbers on October 7, 2008. He did not get any of his property back.

Eighty-three-year-old Nadine Powers testified that on the morning of September 17, 2008, her husband took her to get a radiation treatment. They returned home about 10:30 a.m. She said that "[a] little while" later, someone knocked on the door and rang the doorbell. She answered the door and saw a man and woman standing there. The man asked to speak with her husband. Mrs. Powers said that she turned away from the door, that a man "jumped in" behind her, and that she went to her bedroom in the back of the house. A few minutes later, the man who had been standing at the door rushed into the room. He was holding a pistol, pointed it at her face, and told her to get onto her knees. She said that she was "scared to death" and that the man asked her about a vault. He shook everything out of her purse and took four watches and fifty dollars that had been in it. He forced her to go into the den, sat her on the couch, and bound her with duct tape. After her husband cut her loose, she ran to the front of the house, looked out a window, and saw a dark-colored van backing out of the driveway. Items were scattered all over the house. The robbers took property from her closet and a small safe containing eight thousand dollars.

Mrs. Powers testified that she was not injured during the robbery. The police came to her house and showed her photograph arrays, but she did not recognize anyone. The police showed her additional arrays on October 9, 2008, and she identified the woman who was standing at her front door. She said she also identified the photograph of the man who bound her with tape. Mrs. Powers identified Holloway in court as the man who knocked on her door and bound her hands and feet with duct tape on September 17, 2008. She said she did not see the second robber on September 17, 2008. On cross-examination, Mrs. Powers testified that she did not get any of her property back.

Officer Marcus Tucker of the Memphis Police Department testified that he and his partner responded to a robbery call at the Powers home and were the first officers on the scene. Duct tape was on a table in the living room and on a dresser in a bedroom. Officer Tucker spoke with the victims and gathered information about the suspects. On cross-examination, Officer Tucker testified that he tried to lift fingerprints off the doorknobs on

the front storm door and wooden door but did not find any prints.

Officer Patricia Turnmire of the Memphis Police Department's Crime Scene Investigation Unit went to the victims' home on September 17 and took photographs. The house had not been roped off, and many family members were in the home, which was unusual. Officer Turnmire said that too many people were in the crime scene area and that the scene was "contaminated with people [wandering] around and picking up items." Duct tape that had been removed from one of the victim's hands and wrists was in an ash tray on a table in the living room. Duct tape also was on the dining room table and on a dresser in a bedroom. Officer Turnmire found a flashlight on a bed in a bedroom, and the flashlight was turned on. She collected the duct tape, the flashlight, and other items, including two or three boxes.

On cross-examination, Officer Turnmire testified that she arrived at the house sometime in the afternoon. After she arrived, officers made everyone in the house leave. Due to the contamination of the scene, she did not process it for fingerprints.

Jeffrey Garey of the Memphis Police Department's Crime Scene Investigation Unit testified that he processed the evidence collected by Officer Turnmire. The evidence included a flashlight, a shoe box, and three wads of duct tape. He said he found "ridge detail" on the shoe box and lifted a latent print off the box. Two pieces of duct tape also contained ridge detail.

Martin Milner of the Memphis Police Department's Crime Scene Investigation Unit testified that he evaluated the prints found by Jeffrey Garey. The ridge detail on the shoe box was insufficient to make an identification. The prints lifted off the duct tape did not match the appellants.

Kim West testified that she was charged with facilitation of aggravated robbery in this case and pled guilty. She also had a 2005 conviction for robbery. She said that on September 17, 2008, she participated in the crimes with the appellants and Larrisa Richardson. She said she was walking down the street when Holloway, whom she knew as "Skeet," attacked her and forced her to act as the lookout. She said that she served as the lookout "[d]own the street on Sparks" and that the appellants ran inside the victims' home when the door opened. Holloway entered the house first, Jackson followed him, and Richardson stood outside the door. West said that the appellants and Richardson had arrived at the victims' home in a brown and white van and that she did not ride to the victims' home with them. She said she never saw anyone with a gun on September 17, 2008. However, she acknowledged that in her October 18, 2008 statement to police, she said the appellants had guns. She explained, "The only thing I said that I remember [was] I saw [Richardson]

knocking on the door and I saw them run in. I didn't ever say they had . . . handguns. I don't remember saying that."

West testified that on the morning of September 17, she had heard Holloway and Richardson talking about "going to do a hit" but that "I hear that all the time. I didn't know what they was talking about at the time." She said she heard them talking at "Mr. [Willie's] house," a place where people stayed when they did not have anywhere else to go. She said that Charles Jackson also was at Mr. Willie's house but that she only heard Holloway and Richardson talking about committing the crimes. After the crimes, West saw the victims' property at Mr. Willie's house. She said she saw a safe, jewelry, cellular telephones, and "stuff like that." She said the State had not offered her anything in exchange for her testimony.

On cross-examination, West acknowledged that when she first spoke with the police, she denied being involved. However, the police told her that her three co-defendants had accused her of setting up the robbery and that she would never get out of jail if she did not talk with the officers. She said Sergeant Frank Winston also told her that he would let her go home if she told him "'anything about anything.'" She said she was scared but told the police the truth and "what I saw with my own eyes." She said she told the police that she saw Richardson knock on the victims' door and that she saw the appellants run inside the house. West acknowledged that according to her statement to police, she rode to the victims' home with Richardson and the appellants in a van. However, at trial, she denied riding in the van and said, "Some of that stuff [the police] had in there in the statement, they just punched up together that I didn't even say, about the guns and the van and stuff and then the van, I don't remember saying that." She acknowledged signing her statement and initialing every page. She also acknowledged telephoning Melody Holloway, Willis Holloway's sister, from jail and telling her that the appellant did not have anything to do with the crimes. She said she told Melody Holloway "what she wanted to hear. That's all."

At the conclusion of West's testimony, the trial court allowed the State to introduce West's four-page typed statement to police into evidence. According to the statement, West initially denied participating in the crimes. However, she later said Holloway forced her to participate by putting an ice pick to her neck and threatening to "stick" her. She also said, in pertinent part, the following: Holloway and Richardson planned the crimes on the morning of September 17, 2008. Holloway, Richardson, and Jackson borrowed a brown and white van, and West rode with them in the van to the victims' home. Holloway drove, Jackson sat in the front passenger seat, Richardson sat behind Holloway, and West sat behind Jackson. When they arrived at the victims' house, West got out of the van and "walked off and walked straight down Birdsong." Richardson knocked on the victims' door and "played as the sister." When the door opened, Holloway ran inside the house, and Jackson ran in

after him. West said in the statement, "I did not have anything to do with that [s***]. I seen them and I just walked off. I was the lookout, to let them know if the police or if somebody was coming."

Larrisa Richardson testified that she used to be Charles Jackson's girlfriend and that she knew Kim West and Willis Holloway from "the neighborhood." At the time of the crimes, Richardson and Jackson were living in a room at a rooming house. On September 17, 2008, Richardson participated in the crimes with West, Holloway, and Jackson. She said she knocked on the victims' front door and walked away. Someone answered the door, and the appellants went into the house. Richardson said she did not know why she participated in the crimes, but she acknowledged telling the police she participated in order to get money for her son's birthday.

On cross-examination, Richardson testified that on the morning of September 17, 2008, she and Holloway walked to the victims' home. They did not drive a van. West served as the lookout, but Richardson never saw her. Richardson said that she and Holloway stood at the victims' door, that she knocked on the door, and that she "walked off." Jackson was not standing at the door with them, and she did not know where he was. Sometime after the crimes, the police took her to the police department twice for questioning. The first time, she would not speak with them because she was scared. The second time, she agreed to speak with them because they said she was going to be charged with two counts of aggravated robbery. She acknowledged that the police came to her and Jackson's room on October 8, 2008, and that she signed a consent to search form. She also acknowledged that she pled guilty to facilitation of aggravated robbery in exchange for diversion upon successful completion of a probation sentence. She acknowledged that she violated her probation and that she was testifying in order to help her case.

On redirect examination, Richardson testified that she decided to speak with the police "to do what I had to do for my son." She said she told the police the truth.

Sergeant Myron Fair of the Memphis Police Department's Robbery Bureau testified that he and Sergeant Frank Winston showed six-photograph arrays to Clarence Powers soon after the crimes. The arrays did not contain the appellants' photographs, and Mr. Powers did not identify anyone. On October 7, 2008, the officers showed additional arrays to Mr. Powers. Mr. Powers picked out the appellants' photographs and identified them as the robbers.

On cross-examination, Sergeant Fair acknowledged that Holloway's face was tinted red in the photograph array. He said the tint made Holloway's photograph "[j]ust a little bit different" than the other photos in the array. He said he took Nadine Powers' statement in

January 2009, four months after the crimes.

Sergeant Frank Winston of the Memphis Police Department's Robbery Bureau testified that he arrived at the victims' home about 12:30 p.m. on September 17, 2008. Several bedrooms had been ransacked, and Sergeant Winston saw a flashlight on one of the beds. Based on information he received about the crimes, he developed four potential suspects. He put together photograph arrays containing the suspects' photos. The arrays did not contain the appellants' photographs because the appellants were not suspects at that time. Sergeant Winston showed the arrays to the victims, but the victims did not identify anyone. At that point, Sergeant Winston did not have anymore leads in the case. Later, a confidential informant (CI) gave him the names of Holloway, Jackson, West, and Richardson. Sergeant Winston put together three photograph arrays. One array contained Jackson's photograph, one contained Holloway's photograph, and one contained Richardson's photograph. He showed the two arrays containing the appellants' photographs to Clarence Powers, and Mr. Powers identified the appellants as the robbers. Sergeant Winston did not show the two arrays to Mrs. Powers because she said she could not identify any of the males involved in the crimes. However, Sergeant Winston showed the all-female array containing Richardson's photograph to Mrs. Powers, and she identified Richardson as the woman she saw standing at her front door. The police arrested Richardson, and Sergeant Winston spoke with her. Richardson waived her rights and identified Holloway, Jackson, and West as participants in the crimes. The police also arrested West. West waived her rights, gave a statement about the crimes, and identified photographs of Holloway, Jackson, and Richardson.

On cross-examination, Sergeant Winston testified that when he arrived at the crime scene, the only people in the victims' home were the victims and police officers. No one else was allowed inside. When Sergeant Winston left, the victims' family went inside the house. Sergeant Winston said he did not remember another officer's telling him that the crime scene had been contaminated or that people needed to be removed from the home. He acknowledged that the CI received something, such as money, in exchange for the CI's information. When Sergeant Winston first talked with Richardson, she lied to him. However, she eventually admitted her involvement. He said that when the police arrested West, she was "very defensive" and pretended not to know anything about the crimes. However, she finally admitted her involvement. Sergeant Winston did not tell West she was going to spend the rest of her life in jail. He said he did not obtain statements from Clarence and Nadine Powers until January 2009 because "they were afraid to come outside by themselves" and because he had to cancel several appointments with them due to his being dispatched to other cases.

On redirect examination, Sergeant Winston testified that he spoke with the victims on

September 17, 2008, and on January 9, 2009. The State asked him if the victims' versions of events changed between the day of the crimes and January 2009, and he said, "Not at all." He said that West's statement was typed and that she had an opportunity to correct it. She initialed every page and signed the statement.

Melody Holloway, Willis Holloway's sister, testified for her brother that West telephoned her numerous times from jail. Melody Holloway did not know West, but they discussed the charges against the appellant.

Lenwood Reed testified for Charles Jackson that he was the Logistics Manager for DSC Logistics and the Senior Pastor for First Baptist Church. He said that he had known Jackson for three or four years and that they met "through ministry." They became friends, and Jackson visited Reed's home to wash Jackson's clothes, mow the yard, and clean out the garage. Reed said he was "almost sure" Jackson had a girlfriend in September 2008. One day, Reed received a telephone call from a woman, who was crying and talking about how much she loved Jackson. She told Reed, "'Well, I did what I had to do for me[.]'" He said he did not understand what she meant until later. Defense counsel asked Reed if he remembered seeing Jackson on September 17, 2008. At first, Reed said no. However, he then said he saw Jackson that day because he saw Jackson "on a normal basis." On cross-examination, Reed testified that the woman on the telephone identified herself by her nickname but that he did not remember what she said.

Charles Jackson testified that on September 17, 2008, he and Richardson were living in a room at Mr. Willie's rooming house. When the appellant woke that morning, Richardson was not there. He waited on her for a while and helped Mr. Willie, who was disabled. Afterward, he went to the store to get something for Mr. Willie and returned to the rooming house. Richardson still had not returned, so the appellant walked up the street. He did not see Richardson, so he rode a bus toward downtown. He got off the bus and visited with some people he knew, including the mother of his two daughters. About 9:15 a.m., the appellant got onto another bus and rode downtown. He got off the bus and telephoned Lenwood Reed. Reed picked him up, they got something to eat, and they went to Reed's house. The appellant was at the house about forty-five minutes and washed some clothes he had there. About 12:30 p.m., Reed drove him back to the rooming house. The appellant said he did not know West but had seen her at a store previously. The appellant said he had never seen the victims and denied being a member of a gang or robbing people. He said West could have been lying about his involvement in the crimes in order to protect someone. He acknowledged having a 2002 conviction for felony theft.

On cross-examination, Jackson testified that he knew Holloway "from the streets." He said that Richardson smoked marijuana but that he did not smoke marijuana or crack cocaine.

-8-

He said he did not have a job and paid for his room at the rooming house by selling drugs. The State asked how he remembered his whereabouts on September 17, 2008, and he said, "Simple and plain, that's what happened. I mean, it's me that's doing it so I remember it. . . . [I]t's been in my mind since I've been in here." He said he was arrested for the crimes on October 7, 2008.

The jury found the appellants guilty as charged. After a sentencing hearing, they received ten years for each of their aggravated robbery and aggravated kidnapping convictions, Class B felonies, and four years for their aggravated burglary convictions, Class C felonies. The trial court ordered that the sentences be served consecutively for effective sentences of forty-four years in confinement.

## II. Analysis

### A. Cross-examination of West

The appellants argue that the trial court improperly ruled that they could not question Kim West about her engaging in prostitution just before the crimes. The State argues that the trial court properly excluded West's testimony about prostitution. We agree with the State.

On cross-examination, West acknowledged that she had been charged previously with prostitution. Defense counsel asked, "In fact you were participating in prostitution the day that this happened[?]" The State objected, and the trial court held a jury-out hearing. During the hearing, West testified that on the morning of the crimes, she walked to Sparks Street and engaged in an act of prostitution with a man in his home. The man's house was across the street from the victims' house. When West and the man finished, he told her to look out a window. She said she looked out the window and saw Richardson and the appellants standing at the victims' door. Richardson was knocking on the door. West said that when she left the man's house, Holloway forced her to be the lookout by threatening to stab her with an ice pick.

Counsel for Holloway argued that West's testimony about being engaged in prostitution on the morning of the crimes was admissible because it showed why she was on Sparks Street and was inconsistent with her statement to police in which she said she rode to the victims' home in a van. The trial court concluded that West's engaging in prostitution on the morning of the crimes was irrelevant to any issue in the case and that even if it was relevant, its probative value was substantially outweighed by the danger of unfair prejudice. Regarding West's explanation for how she got to Sparks Street on September 17, the trial court ruled that it was inconsistent with her statement to police and that the defense could

-9-

impeach her with the prior inconsistent statement. The trial court stated,

> Ask her where she claims she was and where she was leaving,
> but inside of the home turning a trick with a John does not add
> any relevance to this jury, so all questions about Johns or
> prostitution, those acts are not admissible, but you may certainly
> ask whether or not she's given a prior statement and indicated
> she was at a home on a street and that she walked outside of the
> home and whatever else she claims that she did[.]

The appellants contend that they should have been allowed to ask West about her engaging in prostitution on the morning of the crimes and that the trial court's refusing to allow them to ask her about the prostitution violated their right to confrontation. They argue that the jury would have found West's inconsistent and "ridiculous" version of events incredible.

Generally, evidence must be relevant to some issue at trial in order to be admissible. See Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). "Under this standard, we will not reverse unless the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Cannon, 254 S.W.3d 287, 295 (Tenn. 2008) (internal quotations and citations omitted).

In this case, West testified during the jury-out hearing that she walked to a man's house on the morning of the crimes, engaged in a sexual act with him, looked out a window, and saw Richardson and the appellants standing at the victims' door. We agree that West's engaging in a sexual act with the man was irrelevant to any issue at trial. The trial court allowed the defense to cross-examine West about how she got to Sparks Street and the inconsistency between her statement and her trial testimony. The trial court did not abuse its discretion by ruling that the defense could not cross-examine West about her engaging in prostitution just before the crimes.

B. Admissibility of West's Statement

The appellants contend that the trial court erred by allowing the State to introduce West's complete, typed statement to police into evidence. The State argues that the trial court properly allowed the prosecution to introduce the statement. We conclude that the trial court erred but that the error was harmless.

After the defense cross-examined West, the State asked that the trial court admit her four-page typed statement into evidence. During a jury-out hearing, the trial court found that West's statement was inconsistent with her trial testimony and that "the statement does appear to have been made under circumstances that indicates it is in fact trustworthy." The trial court held that the statement was admissible pursuant to Tennessee Rules of Evidence 803(26), which provides an exception to the hearsay rule and allows some inconsistent statements to be admitted as substantive evidence. The defense disagreed with the trial court, arguing that the entire statement was not admissible because "if you broke down every sentence in this [statement], that the vast majority of the things that are in here, have been admitted to [by] her." The defense also argued that the statement was not trustworthy because West gave the statement as a result of the officers' telling her that her co-defendants had accused her of setting up the robbery and because she was trying to get out of jail. Regarding the trustworthiness of the statement, the trial court said, "The Court has to make an inquiry as to whether or not the statement was made under circumstances indicating trustworthiness. Whether or not the statement is true, that's a jury question." The trial court maintained that the entire statement was admissible.

When the jury returned to the courtroom, the trial court announced that it was allowing West's statement and Advice of Rights form to be admitted into evidence; that the statement and form would be entered as exhibits number twenty-six and twenty-seven, respectively; and that each juror would receive a copy of the two exhibits. The trial court did not instruct the jurors that they could consider West's statement substantively. However, during the jury charge, the trial court instructed the jury as follows:

> Impeaching a witness: A witness may be impeached by proving that the witness has made some material statements at some point before the witness testified which are different from his or her testimony on the witness stand. However, unless entered as a numbered exhibit by the court and allowed to be taken by you back to the jury room when you deliberate, proof of any prior inconsistent statements may be considered by you only for the purpose of determining whether the witness is telling the truth at trial. The contents of the prior inconsistent

-11-

statement are not to be considered as proof in the trial.

. . . .

Prior consistent statements: Prior consistent statements are admissible to rehabilitate a witness or to respond to impeachment by a prior inconsistent statement. The prior consistent statements cannot be considered by the jury as substantive evidence and is to be used only in assessing the credibility of the witness. Any prior consistent statements can be used only as corroboration of the in court testimony of the witness after impeachment [by] opposing counsel.

"[I]t is well-established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of discretion." State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. Tennessee Rule of Evidence 803(26) provides a hearsay exception for a testifying witness's prior inconsistent statement. The statement is admissible substantively if the following conditions are satisfied:

1. The statement must be admissible under Tennessee Rule of Evidence 613(b).

2. The declarant must testify at the trial or hearing and be subject to cross-examination about the statement.

3. The statement must be audio or video recorded, written and signed by the witness, or given under oath.

4. The trial court must conduct a jury-out hearing to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

Tenn. R. Evid. 803(26) & Advisory Commission Comments. Tennessee Rule of Evidence 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or

the interests of justice otherwise require."

Turning to the instant case, West's statement to police was inconsistent with her trial testimony on two key points. First, West testified on direct examination that she did not see the appellants with guns. The State confronted her with her statement to police, and she said she did not remember telling the police that the appellants had guns. Second, West testified on direct examination that the appellants and Richardson drove a van to the victims' home and that she did not ride in the van with them. On cross-examination, defense counsel for Jackson confronted West with her statement to police, and West denied telling the police about a van.

The appellants argue that the trial court erred by allowing West's entire statement into evidence as opposed to admitting only those portions of her statement that were inconsistent. We agree. The title of Tennessee Rule of Evidence 803(26) plainly states that it applies to prior inconsistent statements, and the Advisory Commission Comments to the rule explain that the rule's reference to Tennessee Rule of Evidence 613 "makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule." Our review of West's statement reveals that much of it was consistent with her trial testimony. Therefore, those consistent portions of her statement were not admissible pursuant to Tennessee Rule of Evidence 803(26).

The appellants also argue that the trial court erred by admitting the entire statement into evidence because West should have been confronted with every question and answer in her statement. Once again, we agree with the appellants. West was given the opportunity to explain or deny only the portions of her statement regarding the guns and the van. She was not confronted about any other parts of her statement. Therefore, even if those parts had been inconsistent with her trial testimony, they would not have been admissible as substantive evidence because the first factor in Rule 803(26), that the statement be admissible under Tennessee Rule of Evidence 613(b), was not satisfied.

Finally, the appellants argue that the trial court erred regarding the fourth factor because the prior statement was not made under circumstances indicating trustworthiness. Our review of the trial transcript shows that the trial court questioned West extensively during the jury-out hearing about the circumstances in which she gave her statement to the police. West told the court that she smoked marijuana on October 16, 2008, two days before she gave her statement. However, she also informed the court that she told the police the truth on October 18 and that she told them "what I saw with my own eyes." The trial court noted that West gave the officers specific information about her personal background, such as her address, telephone number, and social security number, and that her statement was "very detailed" regarding the crimes. Therefore, we cannot conclude that the trial court erred

in determining by a preponderance of the evidence that Richardson made the statement under circumstances indicating trustworthiness.

Having determined that the trial court erred by allowing the complete statement into evidence, we must now determine whether the error was harmless. In a related argument, the appellants note that several portions of West's improperly admitted statement were highly prejudicial. For example, in the statement, West said that Jackson "[sells] crack, robs people and he is down with that crip [s***]" and that Holloway "is known for burglary and robberies in Bunker Hill and people don't [f***] with him." She also stated that the appellants borrowed the van from "some dude" and that the appellants "gave him some dope and money for letting them use it." When the police asked her why the appellants left the house but returned, she said, "[Richardson] asked Holloway if the people seen their face and [Jackson] said 'I don't give a [f***] it is cripping with me'. [Jackson] said 'I will kill them.'"

At the motion for new trial hearing, the trial court found that even if portions of West's statement were consistent with her testimony, the trial court properly instructed the jurors that they could not consider a witness's prior consistent statements as substantive evidence. However, just prior to the instruction on consistent statements, the trial court informed the jury that "unless entered as a numbered exhibit by the court and allowed to be taken by you back to the jury room when you deliberate, proof of any prior inconsistent statements may be considered by you only for the purpose of determining whether the witness is telling the truth at trial." The trial court admitted West's statement as a numbered exhibit and allowed the jury to take it into the deliberation room. Therefore, in our view, the jury could have interpreted the trial court's instruction on inconsistent statements to mean the jury could consider West's entire statement substantively.

That said, while some of the inadmissible portions of West's statement were prejudicial, the evidence against the appellants was strong. Clarence Powers testified that he spent about ten minutes with Jackson on September 16. Less than one month after the crimes, Mr. Powers identified Jackson and Holloway as the men who robbed him on September 17. Mr. Powers also identified the appellants at trial. West and Richardson described the appellants' participation in the crimes, and their versions of the events were consistent with each other and the victims' versions. For example, Richardson and West both testified that Richardson stood at the door with Holloway and that Richardson knocked on the door. Nadine Powers identified Richardson and Holloway as the individuals she saw at the door. She also testified that she saw a dark-colored van back out of her driveway after the robbery, and the trial court properly admitted the portion of West's statement in which she said the appellants used a brown and white van. Therefore, we conclude that although the trial court erred by allowing West's complete statement into evidence, the appellants have failed to demonstrate that the error affected the jury's verdicts. See Tenn. R. App. P. 36(b);

-14-

State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008).

## C. Copies of West's Statement

The appellants contend that the trial court erred by allowing each juror to have a copy of West's statement. Specifically, the appellants argue that because no other exhibits were copied and distributed to the jury, distributing West's statement "placed undue emphasis on that portion of the trial." However, Tennessee Rule of Criminal Procedure 24.1(b)(1) allows a trial court to provide copies of exhibits to jurors "[w]hen the court deems it helpful." In this case, the trial court explained that it was giving each juror a copy of West's statement because "[i]f I gave you one document and asked you all to read it right now, it might take another forty five minutes to an hour for all fourteen people to read that one document. That's why I've given you a copy for your notebook." Moreover, the trial court instructed the jury that

> the fact that you've been given a copy of exhibit twenty-six and twenty-seven does not indicate that those documents have any greater or less importance than any of the other exhibits . . . . [T]here's no significance to the fact that you have a copy of exhibits twenty-six and twenty-seven, other than to save time when you're looking at multiple pages.

Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

Granted, for the reasons discussed in the previous section, the trial court should not have distributed copies of West's complete statement to the jury. However, it was not improper for the trial court to give each juror a copy of the admissible portions of the statement.

## D. Redaction of Statement

The appellants contend that the trial court should have granted their motions for a mistrial because the trial court failed to redact West's statement before the court distributed the statement to the jury. The State claims that the appellants have waived this issue. We agree with the State.

The day after the trial court admitted West's complete statement into evidence and distributed copies to the jury, the appellants moved for a mistrial, arguing that the trial court should have redacted the statement because it contained prejudicial information about gang

affiliations and prior bad acts.  The trial court denied the motion, stating,

> The defense did not make a timely objection and the defense had
> an opportunity to object to parts of the statement if you wanted
> to.  [You did] not object to parts of the statement.  You said,
> "We want the whole statement out," and I'm told this morning,
> "Well, Judge, now that the statement is in, there's some thing
> that maybe we should have objected to."
>
> If there were, and I'm not going to rule in retrospect because a
> timely objection was not made, if there had been a timely
> objection made, the Court would have conducted an inquiry and
> would have made a decision as to whether or not certain parts of
> that statement should have in fact been redacted.  Since a timely
> objection was not made, it is waived.

We agree that the appellants waived the issue by failing to request that the prejudicial
portions of the statement be redacted.  See Tenn. R. App. P. 36(a); State v. Dale Jarnigan,
C.C.A. No. 296, 1989 Tenn. Crim. App. LEXIS 882, at *8 (Tenn. Crim. App. Dec. 19, 1989).
In any event, we have already determined that the admission of West's entire statement was
harmless.  Therefore, the appellants are not entitled to relief.

## E.  Sufficiency of the Evidence

Finally, the appellants claim that the evidence is insufficient to support the convictions
because Clarence Powers misidentified a man at the appellants' preliminary hearing as one
of the robbers and because Nadine Powers' identification of Holloway at trial was suspect
because she told the police shortly after the crimes that she could not identify any of the
males involved.  The appellants also contend that the evidence is insufficient because no
physical evidence linked them to the crimes.  The State argues that the evidence is sufficient
to support the convictions.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard
for review by an appellate court is "whether, after viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979);
Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence
and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage,
571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and
the weight and value to be afforded the evidence, as well as all factual issues raised by the

evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Taken in the light most favorable to the State, the evidence is sufficient to support the convictions. Clarence Powers identified the appellants as the robbers within a month of the crimes and at trial. Nadine Powers identified Holloway at trial as the man who bound her with duct tape. The jury heard and assessed the victims' testimony and determined that their identifications of the appellants were credible and reliable. Moreover, Richardson and West testified that they participated in the crimes with the appellants and that they saw the appellants enter the victims' home. Their versions of the events were consistent with the victims' testimony. Although Jackson testified that he was with Lenwood Reed at the time of the crimes, the jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. Therefore, the evidence is sufficient to support the convictions.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by admitting West's complete statement to police into evidence. However, we conclude that the error was harmless and affirm the appellants' convictions.

_____
NORMA McGEE OGLE, JUDGE